IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

CAMERON GERALD NIGH,

                    Plaintiff,                              CV-09-81-ST

          v.                                               OPINION AND
                                                           ORDER
MICHAEL J. ASTRUE,
Commissioner of Social Security,


_____ Defendant. _____


STEWART, Magistrate Judge:                    **INTRODUCTION**

        Plaintiff, Cameron Gerald Nigh ("Nigh"), seeks judicial review of the final decision by

the Social Security Commissioner ("Commissioner") denying his application for Supplemental

Security Income ("SSI") under Title XVI and Disability Insurance Benefits under Title II of the

Social Security Act ("SSA"), 42 USC §§ 401-33.  This court has jurisdiction to review the

Commissioner's decision pursuant to 42 USC § 405(g) and § 1383(c)(3).  All parties have

1 - OPINION AND ORDER

consented to allow a Magistrate Judge to enter final orders and judgment in this case in

accordance with FRCP 73 and 28 USC § 636(c).  For the reasons set forth below, the

Commissioner's decision is REVERSED and REMANDED for further proceedings.

## ADMINISTRATIVE HISTORY

Nigh protectively filed for SSI and DIB on July 28, 2004, alleging a disability onset date

of June 15, 2003.  Tr. 19.[1]  His application was denied initially and on reconsideration.  Tr. 55-

57-63, 248-56.  On May 14, 2007, a hearing was held before Administrative Law Judge ("ALJ")

Thomas Tielens.  Tr. 275-301.  The ALJ issued a decision on September 13, 2007, finding Nigh

not disabled.  Tr. 19-28.  The Appeals Council denied Nigh's request for review on November

25, 2008 (Tr. 7-9), making the ALJ's decision the Commissioner's final decision.

## BACKGROUND

Nigh was born in 1963 and was age 44 at the time of the hearing before the ALJ.  Tr.

278.  He has attended some college and has past relevant work experience as private

investigator, salesman, and waiter.  Tr. 26, 278-80.  He alleges that he is unable to work due to

Crohn's disease,[2] fatigue, and a stomach disorder.  Tr. 91.

### I.  Claimant's Testimony

#### A.  Written Testimony

Nigh worked in the food service industry as a waiter from approximately 1989 to 2003,

but left due to the long hours and his inability to stay on the work floor to serve customers.

---

[1] Citations are to the page(s) indicated in the official transcript of record filed on June 3, 2009 (docket #12).

[2] "Crohn's disease is a chronic, inflammatory disease of the gastrointestinal tract which produces symptoms such as severe abdominal pain, cramping, nausea, fatigue, diarrhea, and insomnia. Crohn's disease also causes fistulas – abnormal passages between two internal organs or an internal organ and the surface of the body.  The disease is often accompanied by periods of inactivity as well as a high rate of recurrence after treatment."  *Dix v. Sullivan*, 900 F2d 135, 136 (8th Cir 1990).

Tr. 77.  He then worked part-time as a private investigator approximately 12 hours a week, but that job ended on June 15, 2004, due to his fatigue and sudden, sometimes lengthy, restroom breaks.  Tr. 70, 92.  He previously could work long hours and long days, but now has no strength for such work.  Tr. 105.

In his Adult Function Report completed on August 15, 2004, Nigh reported that on a typical day, he will get up, rest, go to the restroom, run a few small errands, go to the restroom, read, rest, and go to sleep.  Tr. 112.  At night, he sleeps two to three hours, wakes up, uses the restroom, falls asleep for awhile, and repeats the cycle throughout the night.  Tr. 122.  He is able to make simple meals such as soups, sandwiches, or frozen meals.  Tr. 114.  He needs no reminders to take care of personal needs or to take medicine and experiences no difficulties with personal care, other than needing to stay near a restroom or else risk an accident.  Tr. 113.  Nigh does laundry and dusts approximately two days a week, but cannot do much else due to his fatigue.  Tr. 114-15.  He can drive himself to the store or to the movies and goes out about once a day.  Tr. 115.  He used to enjoy golfing, scuba, kayaking, and climbing, but now mostly reads, writes, and watches movies.  Tr. 116, 120.  He goes to church on a regular basis and spends time with others two to three times a week, sitting, talking, or watching television.  Tr. 116.

Nigh reported difficulty with lifting, bending, and climbing stairs because his joints "feel like they are old," and he tires quickly.  Tr. 117.  He can walk for only three or four blocks, stand for about one hour, sit for two hours, bend frequently, and lift 40 pounds occasionally.  Tr. 117, 122.  Depending on the activity, he can be active between one and five hours before needing to rest.  Tr. 120.  At one time he took Prednisone, but it made his joints feel "like [he] was 85," and

it took him a long time, sometimes as long a five minutes, to get to his feet.  Tr. 123.  He

reported starting to feel depressed and overwhelmed. Tr. 118.

He has no difficulty paying attention or following written and spoken instructions and

has never lost a job for not getting along with people.  Tr. 117-18.

In supplemental function reports dated March 1, 2005, Nigh related similar daily

activities, fatigue complaints, and a need for restroom access.  Tr. 147-61.  He experiences

burning in his stomach, aching in his joints, and a cramping abdomen, all of which are "constant

to varying degrees," and seem to worsen when he wears himself out.  Tr. 159.  He believed that

"with proper care and rest I can beat this [and] be productive again, but the fatigue, frequent

bowel problems, [and] depression are getting worse without care."  Tr. 154.

### B. <u>Hearing Testimony</u>

At the hearing on May 14, 2007, Nigh testified that he is unable to work because of his

extreme fatigue and diarrhea.  Tr. 281.  He gets fatigued "doing almost nothing" and feels good

for only two to three hours a day, after which he feels like he worked a 14 or 15 hour day.  *Id*.

When the fatigue sets in, he is unable to do anything other than sit.  *Id*.  His diarrhea has

presented daily problems for seven years and, when at its worst, he has to visit the restroom 10-

15 times a day for 10-45 minutes at a time.  *Id*.  On bad days, he experiences severe cramping

and has to go to the restroom so often he cannot be more than a room away; even then,

sometimes he does not make it.  Tr. 281-82.  Nigh also described other symptoms that have

manifested themselves since the onset of his disability, including skin lesions and a paralyzing

pain that radiates down his back, mostly when he finds himself in tense situations.  Tr. 286.

Nigh does not have insurance or income to pursue treatment for Crohn's disease, but his mother's doctor, Kenneth G. Schmidt, M.D., has agreed to see him "every few months, to make sure [he is] not going further downhill" and occasionally will give him "a little medication or something for an [*sic*] anemia or a low potassium, depression, things like that."  Tr. 282, 295. Dr. Schmidt made arrangements for Nigh to see a gastroenterologist a couple of times at a reduced payment.  Tr. 295-96.  At the time of the hearing, Nigh was taking a medication for his depression and had just finished taking potassium.  Tr. 283.  None of his past medications stopped the severe diarrhea, and he had to quit a job selling wines to restaurants because he was unable to get to the restroom when stuck in traffic.  *Id*.

Nigh discussed his efforts at securing financial assistance for medication, stating that he filled out several forms in June 2005 to apply for compassionate care for Remicade to treat his Crohn's disease, but never heard back regarding the status of his application.  Tr. 293-94.

## II.  Medical Records

Based on a referral by Dr. Schmidt, Nigh saw Patrick R. Maveety, M.D., a gastroenterologist, on June 3, 2004, for an evaluation of diarrhea which reportedly began abruptly in 1999 at the end of Nigh's marriage.  Tr. 215-18.  Nigh reported that he was initially treated by a family practitioner and later by a gastroenterologist, ultimately resulting in a diagnosis of ulcerative colitis.  *Id*.  After a failed treatment with Rowasa, Nigh had a colonoscopy in 2002.  *Id*.  At that time, he was told he had inflammatory bowel disease, either Crohn's disease or ulcerative colitis.  *Id*.  Since that time he has been treated with Prednisone, Asacol, and iron, and was last treated unsuccessfully with antibiotics in approximately June 2003.  *Id*.

At that time, Nigh weighed 154 pounds and reported having 10-15 watery bowel movements per day with occasional cramping. *Id.* Based upon Nigh's account of his symptoms and a positive p-ANCA, Dr. Maveety opined that this was "certainly suggestive of ulcerative colitis." Tr. 216. Dr. Maveety found it curious that Nigh did not had a positive response to Prednisone, that his stool tested negative for occult blood, and "that he is not sicker than he is, if he has been having continuous ulcerative colitis for four or five years." *Id.* Since Nigh's medical records had been difficult to obtain, he found it hard to get a complete picture of his condition. Tr. 217. Dr. Maveety ordered several blood and stool tests, which were completed on July 26, 2004, with negative results. Tr. 220-22.

Nigh next saw Dr. Maveety on October 7, 2004, reporting that he was still experiencing 10-15 loose bowel movements daily, with occasional bleeding and cramping. Tr. 213. Dr. Maveety ordered a small bowel follow through, noted that diagnosis and treatment was limited by financial considerations, and mentioned that Nigh might want to consider looking into financial assistance for Remicade. *Id.* At that time, Nigh weighed 150 pounds. *Id.*

On October 12, 2004, Nigh had the small bowel follow through which produced "markedly abnormal" results, showing "diffuse moderate narrowing to the entire distal half of the ileum . . . with a granular mucosal pattern [and] a questionable second focus of involvement in the more proximal ileum." Tr. 219. The findings were "most compatible with Crohn's disease." *Id.*

At his next and last appointment with Dr. Maveety October 28, 2004, Nigh weighed 152 pounds and reported continued fatigue and 12-13 loose stools per day with occasional bleeding. Tr. 212. In discussing treatment for the Crohn's disease, Nigh indicated that he thought he could

afford Azathioprine, though they also discussed participation in drug trials and financial assistance. *Id.*

On November 11, 2004, Dr. Maveety's office provided Nigh with Remicade financial assistance information. Tr. 211. During several follow-up phone calls throughout December 2004, Nigh indicated that he was not experiencing any change in his symptoms, but would make an appointment if he was able to get Remicade. Tr. 210. At that time, Nigh indicated that he would fill out the paperwork for Remicade financial assistance by January 1, 2005. *Id.*

In December 2004, a Disability Determination Services ("DDS") physician completed a physical RFC assessment, concluding that Nigh could occasionally lift 20 pounds, frequently lift 10 pounds, stand, walk, and sit with normal breaks six hours in an eight hour day, and had no postural, manipulative, visual, communicative, or environmental limitations. Tr. 201-06. In reaching this conclusion, the DDS physician noted that Nigh's stated limitations were not supported by the medical evidence. Tr. 208.

On January 4, 2005, Nigh, weighing 152 pounds, was evaluated by Dr. Schmidt for Crohn's disease, iron-deficiency anemia, ongoing fatigue, mild dermatitis, and mild renal insufficiency. Tr. 228. Dr. Schmidt noted that Nigh was being followed by Dr. Maveety, and that the mild dermatitis was probably related to the Crohn's disease. *Id.*

In a letter dated March 2, 2005, Dr. Maveety stated that he had seen Nigh three times, spoken to him on the telephone at least once, and received some records from previous evaluations. Tr. 209. He was "fairly confident" that Nigh suffers from Crohn's disease and noted that at each visit, Nigh reported 10-15 loose bowel movements per day with occasional cramping. *Id.* While he could not provide a definitive answer regarding Nigh's ability to work

which depended largely upon self-reported symptoms, he opined that he "may not have the stamina to work a full 40-hour week" due to his chronic diarrhea. *Id*. Finally, Dr. Maveety noted that he thought that Nigh's disease was treatable, but that Nigh was indigent and unable to afford treatment. *Id*.

On April 7, 2005, Linda Jensen, M.D., reviewed Nigh's file for the DDS, noting that while Nigh has Crohn's disease and moderate anemia, she considered his account of his symptoms only partially credible because the objective evidence in the file, including his "stable weight," did not support the severity of symptoms alleged. Tr. 223. Moreover, Dr. Jensen only partially accepted Dr. Maveety's opinion that Nigh might not have the stamina for full-time work because it was based upon Nigh's self reports and did not fully consider other factors. *Id*.

When Nigh saw Dr. Schmidt on June 23, 2005, he had not yet filled out the compassionate care forms to secure financial assistance for Remicade. Tr. 227. Nigh reported that he was experiencing fatigue and severe depression, abdominal pain with occasional cramping, and was using the restroom between five and 10 times a day. *Id*. At that time, he weighed 153 pounds. *Id*.

On November 28, 2005, Nigh's application for airman medical certification was denied by the Federal Aviation Administration ("FAA") because of his active Crohn's disease, depression, and fatigue. Tr. 224.

On January 11, 2006, Nigh reported to Dr. Schmidt that he had waxing and waning Crohn's disease symptoms which worsened after a recent trip to California. Tr. 226. Nigh weighed 149 pounds and reported that he had not followed up with Dr. Maveety regarding

Remicade therapy because he could not afford it.  *Id.*  Dr. Schmidt opined that Nigh's ongoing

fatigue was related to the Crohn's disease or possibly some underlying depression.  Tr. 238.

During his next visit to Dr. Schmidt on July 18, 2006, Nigh weighed 141 pounds and

reported that he had not seen Dr. Maveety for approximately 18 months and was waiting on

disability for his Crohn's disease.  Tr. 225, 238.  Nigh reported mild discomfort in his lower

abdomen, ongoing fatigue, mild renal insufficiency and proteinuria.  Tr. 225.  Dr. Schmidt

ordered some lab work to check his creatinine levels, which were low.  Tr. 225, 229.

On February 13, 2007, Dr. Schmidt noted that Nigh weighed 148 pounds and reported

urinary tract and ongoing diarrhea problems.  Tr. 237.  Additionally, Nigh reported persistent

headaches, occasional tingling in his arms and legs, and "spells" associated with getting into an

argument, which caused him cervical pain.  Tr. 238A.  A blood check for iron deficiency anemia

was normal, though Nigh was taking iron daily.  *Id.*  Dr. Schmidt completed lab work and opined

that the ongoing fatigue was related to Crohn's disease or the borderline iron deficiency.  *Id.*

After the hearing, the ALJ asked Dr. Maveety about Nigh's efforts to obtain medication

to treat his Crohn's disease.  Tr. 245.  In a letter dated May 17, 2007, Dr. Maveety responded

that he initially concluded that Nigh had inflammatory bowel disease which had been

unresponsive to steroids and that further testing and treatment was hampered by financial

concerns.  Tr. 246.  At the October 28, 2004 visit, they discussed Remicade and Azathioprine,

but no decision was made about treatment.  *Id.*  On November 11, 2004, his office provided Nigh

with contact information to explore the possibility of financial assistance.  *Id.*  Dr. Maveety's

office last had contact with Nigh on December 29, 2004, when Nigh indicated that he planned to

fill out the paperwork for financial assistance and would schedule an appointment if he felt he

needed one. *Id*.

## III. <u>Lay Testimony</u>

### A. <u>Nigh's Mother</u>

In a letter dated May 13, 2004, Nigh's mother stated that in February 2003, Nigh moved

from California to live with her because of his illness. Tr. 76. For the first two months, he slept

most of the time and was so weak he could not move around much, and she "wasn't sure he

would make it." *Id*. He spent much of his time in the restroom which drained him of his

strength. *Id*. During this time, Nigh tried to work, but "it really drain[ed] him," so she is his

primary means of support. *Id*.

On August 17, 2004, Nigh's mother completed a Third Party Function Report, stating

that she has been taking care of Nigh for the previous two years. Tr. 124. On a typical day,

Nigh spends most his time resting and uses the restroom 10-15 times. *Id*. Before his illness, he

was very active in sports and worked as a waiter and private investigator. Tr. 125. He has no

trouble with personal care, other than needing to be close to a restroom. *Id*. He used to be able

to cook large meals, but now could only make sandwiches and lighter meals and only help

around the house with half-hour tasks. Tr. 126. Nigh is depressed and experiences difficulty

lifting, squatting, sitting, kneeling, climbing stairs, bending, standing and walking because of

muscle stiffness, joint ache, and general weakness. Tr. 129-30.

Nigh's mother completed another report on March 2, 2005, relating similar observations.

Tr. 162-70. Regarding access to a restroom, she indicated that Nigh has an "urgent need for use"

which "comes on instantly." Tr. 163. As for housework, she related that he no longer has the

strength to do anything other than his own laundry which takes him about two hours to complete due to his fatigue.  Tr. 164.  Nigh was too weak to lift very much weight and was experiencing problems with concentrating and completing tasks.  Tr. 167.

Nigh's mother also submitted a brief undated letter relating the frequency of Nigh's restroom usage, his trouble sleeping, depression, stomach cramps, and immune system.  Tr. 196.

**B.  Nigh's Girlfriend**

On May 12, 2007, Charlotte Kennedy ("Kennedy"), Nigh's girlfriend, wrote a letter on Nigh's behalf.  Tr. 198.  At the time, she had known Nigh for four years after meeting him when he worked as a part-time private investigator.  *Id*.  Even then, Nigh could only work a couple of hours a day before needing to rest and often had to take several days off at a time to regain his strength.  *Id*.  He finally quit working because he did not have the energy to put in a full day's work.  *Id*.

She gave similar testimony at the hearing, adding that Nigh is unable to engage in daytime activities for more than a couple of hours before needing to rest, usually cannot get a full night's sleep, and has to make frequent trips to the restroom.  Tr. 288.

**C.  Other Lay Testimony**

Bette Richey ("Richey") submitted a letter dated May 7, 2007, describing her observations over the four years Nigh has been living with his mother since returning to Oregon.  Tr. 197.  She said that Nigh has "flar[e] ups" of his symptoms that "cause him to go to bed for a period of time."  *Id*

Amy D. Heider ("Heider") wrote a letter dated May 10, 2007, relating her observations of Nigh's capabilities with which her husband agreed.  Tr. 192-93.  Heider has known Nigh

since 1983 when he was an active, high energy person.  Tr. 192.  Beginning in 2002, she could

see Nigh's health declining, and when he moved back to Oregon in 2003, she started to notice

his frequent restroom trips, mentioning several specific instances where he would spend a

significant amount of time in the restroom.  *Id*.  Around the time Nigh began his private

investigator work, she noticed his health decline, as he could no longer easily go up stairs,

seemed to have lost a significant amount of weight, got ill with "any virus making the rounds,"

and needed at least three days to "bounce back" from any kind of activity.  Tr. 192-93.

        Nigh's former employer, J. Mark Lawrence, ("Lawrence"), in a letter dated May 14,

2007, indicated that while he found Nigh to be "smart and a hard worker," and a "very good

private investigator," he could not continue to employ him because his "physical condition is so

restrictive."  Tr. 190-91.  Although Lawrence was aware that Nigh had a medical condition that

limited his ability to work long hours or to commit to specific days, he thought Nigh could work

around his illness since private investigation generally allows several weeks to finish

assignments.  Tr. 190.  Lawrence realized he could no longer keep Nigh when, during a trial,

Nigh became so exhausted that they had to cut back work hours and interviews "to the point that

it put the case in jeopardy."  *Id*.  Lawrence observed that he "was with him 24 hours a day and

saw how he tried, and desired to keep working, but his body simply could not do it."  *Id*.  He also

described his personal knowledge of Nigh's frequent, urgent need to use the restroom.  *Id*.

        In an undated letter, William Davis ("Davis") observed that Nigh's condition appeared to

have deteriorated over the past three years.  Tr. 194-95.

///

///

12 - OPINION AND ORDER

## DISABILITY ANALYSIS

In construing an initial disability determination, the Commissioner engages in a sequential process encompassing between one and five steps.  20 CFR §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled.  20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 CFR §§ 404.1520(a)(4)(ii), 416.909, 416.920(a)(4)(ii).  Absent a severe impairment, the claimant is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR § 416.920(a)(4)(iv).  If the claimant cannot perform past relevant work, then at

step five, the ALJ must determine if the claimant can perform other work in the national economy.  *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC.  *Id.*  If the Commissioner meets this burden, then the claimant is not disabled.  20 CFR §§ 404.1566, 416.966.

## ALJ'S FINDINGS

At step one, the ALJ concluded that Nigh has not engaged in any substantial gainful activity since the onset of his alleged disability.  Tr. 21.

At step two, the ALJ determined that Nigh suffers from the severe impairments of Crohn's disease and depression.  Tr. 21-22.

At step three, the ALJ concluded that Nigh does not have an impairment or combination of impairments that meets or equals any of the listed impairments.  Tr. 22.  The ALJ decided that Nigh has the RFC to "perform light work except he requires access to a restroom before and after work, during lunch, and at mid-morning and mid-afternoon.  He is limited to simple work."  *Id*.

At step four, the ALJ  found that Nigh is unable to perform his past relevant work as a private investigator, salesman, and waiter.  Tr. 26.  At step five, the ALJ concluded that considering Nigh's age, education, and RFC, he was capable of performing other work that exists in significant numbers in the national economy as an office helper or room cleaner.  Tr. 26.  Accordingly, the ALJ concluded that Nigh was not disabled at any point through the date of the ALJ's decision on  September 13, 2007.  Tr. 27-28.

**STANDARD OF REVIEW**

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  The reviewing court may not substitute its judgment for that of the Commissioner.  *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading. *Lingenfelter*, 504 F3d at 1035; *Batson*, 359 F3d at 1193.

**DISCUSSION**

Nigh asserts that the ALJ's decision should be reversed and remanded for an award of benefits because it is not supported by substantial evidence and contains errors of law.  In particular, he contends that the RFC assessment failed to accurately reflect his limitations based upon his testimony and that of numerous lay witnesses.  As a result, he contends that the ALJ failed to meet his burden at step five by presenting a hypothetical to the VE which was based upon a faulty RFC that failed to take into account all of his limitations.

**I. RFC Assessment**

**A. ALJ's Finding**

Nigh takes issue with the ALJ's wording of the restroom limitation included in the RFC and presented to the VE.  As worded in the RFC, Nigh "requires access to a restroom before and

after work, during lunch, and at mid-morning and mid-afternoon." Tr. 25. Elsewhere in the opinion, the ALJ mentions that "there is no evidence that [Nigh] would have difficulties with a work environment in which he had ready access to a restroom." Tr. 22. Nigh argues that the ALJ erred by failing to include this need for "ready access to a restroom" in the RFC.

The RFC assessment describes the work-related activities a claimant can still do on a sustained, regular and continuing basis, despite the functional limitations imposed by her impairments. 20 CFR §§ 404.1545(a), 416.945(a); SSR 96-8p. The ALJ must reach the RFC assessment based on all the relevant evidence in the case record, including medical reports and the effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment. *Robbins*, 466 F3d at 883. The ALJ, however, need not incorporate limitations identified through claimant testimony or medical opinions that the ALJ permissibly discounted. *Batson*, 359 F3d at 1197.

The record supports Nigh's contention that he needs frequent access to a restroom, since he must use the restroom multiple times a day, sometimes for a lengthy periods of time and often without notice. In fact, the common thread throughout the medical and lay testimony is consistent reporting of Nigh's frequent need to use the restroom. *See* Tr. 124, 163, 190, 192, 209, 212-13, 215, 225-27, 237, 288. However, Nigh's restroom access is based on his subjective complaints and, thus, is closely tied to the ALJ's evaluation of his credibility and of the lay testimony.

### B. **Nigh's Credibility**

While Nigh does not directly challenge the ALJ's credibility assessment, it is relevant to whether the ALJ properly incorporated his restroom access needs into the RFC and resulting

hypothetical to the VE.  When a claimant's medical record establishes the presence of a

"medically determinable impairment" that "could reasonably be expected to produce the

[claimant's alleged] pain or other symptoms," the ALJ must evaluate the claimant's credibility in

describing the extent of those symptoms.  20 CFR § 404.1529.  If the ALJ determines that the

claimant's report is not credible, he must make "findings sufficiently specific to permit the court

to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*,

278 F3d 947, 959 (9th Cir 2002), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991)

(*en banc*).  Unless the record contains affirmative evidence of malingering, the ALJ must offer

specific, clear and convincing reasons for rejecting the claimant's testimony about the severity of

his symptoms.  *Carmickle v. Comm'r*, 533 F3d 1155, 1160 (9th Cir 2008).

     When making a credibility evaluation, the ALJ may consider objective medical evidence

and the claimant's treatment history, as well as any unexplained failure to seek treatment or

follow a prescribed course of treatment.  *Smolen v. Chater*, 80 F3d 1273, 1284 (9th Cir 1996).  In

weighing a claimant's credibility, the ALJ may also consider the claimant's daily activities, work

record, and observations of physicians and third parties in a position to have personal knowledge

about the claimant's functional limitations.  *Id*.  In addition, the ALJ may rely on:

> (1) ordinary techniques of credibility evaluation, such as the
> claimant's reputation for lying, prior inconsistent statements
> concerning the symptoms, and other testimony by the claimant that
> appears less than candid; (2) unexplained or inadequately
> explained failure to seek treatment or to follow a prescribed course
> of treatment; and (3) the claimant's daily activities.

*Id*; *see also* SSR 96-7P.

     A finding that a claimant lacks credibility cannot be premised solely on a lack of medical

support for the severity of pain.  *See Lester v. Chater*, 81 F3d 821, 834 (9th Cir 1995).  However,

a credibility finding supported by substantial evidence in the record cannot be disturbed. *Thomas*, 278 F3d at 959, citing *Morgan v. Comm'r*, 169 F3d 595, 600 (9th Cir 1999).

Here, the ALJ concluded that Nigh's testimony concerning the limiting effects of his symptoms was not credible. Tr. 24. Since there is no evidence of malingering, the ALJ was required to provide clear and convincing reasons in order to reject Nigh's testimony.

The ALJ cited Nigh's failure to pursue treatment as the primary reason for discrediting his account of the severity of his symptoms. Tr. 25. The ALJ found it significant that Nigh has no insurance and is unable to afford treatment, yet failed to follow up with paperwork to secure financial assistance for medication related to his Crohn's disease. *Id.* At the hearing, Nigh testified that he filled out the paperwork and gave it to Dr. Maveety's office sometime after June 2005, but never heard anything back and did not know the status of his application. Tr. 293-94. However, after the hearing, Dr. Maveety indicated that on November 11, 2004, his office had provided Nigh with contact information to explore the possibility for financial assistance, but by December 29, 2004, Nigh had not yet filled out the paperwork. Tr. 245. Dr. Maveety has not heard from Nigh since then. *Id.* The ALJ also noted that at his last visit with Dr. Maveety in late October 2004, Nigh thought that Azathiorprine would be affordable, yet also failed to pursue this treatment. Tr. 25. Given the debilitating symptoms reported by Nigh and the fact that Dr. Maveety indicated that the condition is treatable, the ALJ found it "somewhat implausible" that Nigh has entirely failed to pursue treatment options, leading to the inference that his symptoms were not severe enough to compel him to diligently seek treatment. Tr. 25.

"'It flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him.'" *Gamble v.*

*Chater*, 68 F3d 319, 322 (9th Cir 1995), quoting *Gordon v. Schweiker*, 725 F2d 231, 237 (4th Cir

1984).  However, an ALJ may draw an adverse inference as to the credibility of disabling

symptoms from an unexplained failure to seek treatment.  *Bruton v. Massanari*, 268 F3d 824,

828 (9th Cir 2001); *Fair v. Bowen*, 885 F2d 597, 603 (9th Cir 1989) ("[A]n unexplained, or

inadequately explained, failure to seek treatment . . . can cast doubt on the sincerity of [a]

claimant's pain testimony.").  Although the ALJ found that Nigh suffers from depression, the

record does not indicate that this mental impairment precludes him from completing the

necessary paperwork to obtain financial assistance.  *See Nguyen v. Chater*, 100 F3d 1462, 1465

(9th Cir 1996) ("'[I]t is a questionable practice to chastise one with a mental impairment for the

exercise of poor judgment in seeking rehabilitation.'"), quoting *Blankenship v. Bowen*, 874 F2d

1116, 1124 (6th Cir1989).  The record fails to reveal any other justifiable reason why Nigh failed

to pursue treatment.  However, it is unclear whether Nigh was given an opportunity to respond to

the post-hearing evidence from Dr. Maveety that he failed to complete the paperwork.  Had he

been given that opportunity, he may have proffered some credible explanation for his failure to

follow-up with Dr. Maveety to obtain financial assistance for treatment.  Without that

information, the ALJ could not draw a clear and convincing adverse inference as to Nigh's

credibility.

The ALJ also relied upon the lack of medical evidence supporting Nigh's account of the

debilitating effects of his symptoms.  Tr. 24.  "Although lack of medical evidence cannot form

the sole basis for discounting testimony, it is a factor that the ALJ can consider."  *Burch v.*

*Barnhart*, 400 F3d 676, 681 (9th Cir 2005).  The ALJ noted the absence of any medical records

prior to June 3, 2004, despite Nigh's alleged onset date of June 15, 2003, and the lack of

objective evidence to support his account of his symptoms.  Tr. 24.  The lack of prior medical records is suspect.  In fact, Dr. Maveety was surprised that Nigh was not sicker, given his account of his symptoms.  Tr. 216.  However, Nigh's ability to afford treatment has been hindered by his meager financial resources which also could account for the lack of medical evidence in the record.  Additionally, a small bowel follow through in October 2004 showed findings consistent with Crohn's disease, providing at least some objective medical evidence to lend support to Nigh's complaints.  Tr. 219.  Although the lack of medical evidence may be a legitimate factor to consider, it does not rise to the level of a clear and convincing reason to discredit Nigh's testimony.

The ALJ further discredited Nigh's testimony that his symptoms require him to be close to a restroom at all times because he had been able to travel to California on at least two occasions, goes out to dinner and movies with his girlfriend, and recently worked part-time as a private investigator.  Tr. 25.  An ALJ may rely upon inconsistencies in finding a claimant not credible.  *Smolen*, 80 F3d at 1284.  However, the record reveals that Nigh lost his part-time job as a private investigator due to his symptoms and does not reveal how his travel and social activities are inconsistent with his symptoms.  Absent further development of the record, these cited inconsistencies are not a clear and convincing reason to discredit Nigh's testimony.

The ALJ also questioned Nigh's claim of chronic, severe diarrhea 10-15 times a day for several years because his weight "remained quite stable" during the three years of treatment records.  Tr. 25.  The record does not support this characterization of Nigh's weight.  In June 2004, Nigh weighed his heaviest at 154 pounds.  Tr. 215.  Although Nigh's final recorded weight was 148 pounds on February 13, 2007 (Tr. 237), in July 2006, he weighed his lightest at 141

pounds.  Tr. 215.  In the two years between June 2004 and July 2006, he suffered about an 8%

drop in weight which is not insignificant.  The record also contains evidence from lay testimony

that over the course of several years, Nigh appeared to have lost a significant amount of weight.

Tr. 192-93.  The ALJ may have been relying on the April 2005 opinion by reviewing physician

Dr. Jensen.  Tr. 223.  However, Nigh continued to lose weight over the next year which the ALJ

ignored.

Thus, the ALJ erred by failing to provide clear and convincing reasons to discredit

Nigh's testimony regarding the severity of his symptoms.

### B. Lay Witness Testimony

Nigh argues that the ALJ improperly rejected the testimony of several lay witnesses.  Lay

witness testimony, including family members, about their own observations regarding the

claimant's impairments must be considered by the ALJ.  *Smolen*, 80 F3d at 1288.  Testimony

from lay witnesses who see the claimant on a regular basis is of particular value because they

can often ascertain whether the claimant is malingering or truly suffering.  *Dodrill v. Shalala*, 12

F3d 915, 919 (9th Cir 1993).  To discount the statements of lay witnesses, the ALJ must give

"germane reasons."  *Lewis v. Apfel*, 236 F3d 503, 511 (9th Cir 2001).  Inconsistency with the

medical evidence may constitute a germane reason.  *Id*, at 512.  "[W]here the ALJ's error lies in

a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court

cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ,

when fully crediting the testimony, could have reached a different disability determination."

*Stout v. Comm'r*, 454 F3d 1050, 1056 (9th Cir 2006).

Here, much of the record consists of statements from lay witnesses describing the limiting effects of Nigh's symptoms.  Nigh's girlfriend related Nigh's difficulty in maintaining full-time work due to his fatigue, need for frequent rest after engaging in most activities, and frequent trips to the restroom, lasting at least 30 minutes.  Nigh's mother observed the deterioration of Nigh's condition since he had been living with her, including his inability to help around the house any longer due to fatigue, except to do his own laundry, his symptoms of depression, and his increasingly persistent, often urgent, need to use the restroom.  Nigh's former employer observed Nigh's limitations in the workforce and need to use the restroom for lengthy periods of time.  Three other witnesses also described their observations of Nigh's deteriorating condition, including loss of weight, frequent and lengthy trips to the restroom, and lengthy recovery from any kind of activity.

The ALJ summarily rejected the testimony of Nigh and his girlfriend, stating that "the statements of claimant and [claimant's girlfriend] concerning the persistence and limiting effects of these symptoms are not entirely credible."  Tr. 24.  As for the rest of the lay testimony, the ALJ recounted some of the observations offered by the several other lay witnesses and then rejected their testimony as not entirely credible because:

> The allegations of these individuals is not entirely credible.  There is no evidence of joint pain or weakness in the medical evidence of record. While he may experience some fatigue and episodes of diarrhea, his failure to pursue treatment for his symptoms indicates they are less severe than alleged.  Contrary to the statement of the Heiders, the claimant's weight has remained fairly consistent over the past three years.

Tr. 26.

While the ALJ included an accurate summary of the lay testimony, he did not provide specific reasons, germane to each witness, for rejecting the testimony.  Instead, he lumped the

testimony together and rejected it due to the lack of medical evidence and its reliance on Nigh's discredited self-reports.  However, all of the lay testimony recounts specific observations and interactions with Nigh over the course of the relevant disability period.  In particular, Nigh's girlfriend testified to her observations of Nigh's deteriorating energy over four years, as well as his trouble sleeping and frequent trips to the restroom.  Nigh's mother provided several detailed reports of her observations of Nigh's increasing limitations during the three years he has been living with her.  Nigh's former employer offered a detailed account of his personal knowledge of Nigh's limitations and the impact those limitations had on his ability to do his job, ultimately causing him to terminate his employment.

Given the relatively limited objective medical evidence and the largely self-reported symptoms, lay testimony of this kind is particularly important in evaluating a claimant's abilities and impairments.  While the ALJ may disagree with the testimony regarding some of the symptoms observed, such as joint pain, these reasons are not sufficient to disregard, without comment, all the other testimony provided by the lay witnesses which lends support to Nigh's claim.  The ALJ erred by disregarding the testimony without providing germane reasons specific to each witness.

## II.  **Step Five Burden**

At step five, the Commissioner must show that the claimant can do other work which exists in the national economy.  *Andrews v. Shalala*, 53 F3d 1035, 1043 (9th Cir 1995).  The Commissioner can satisfy this burden by eliciting the testimony of a VE regarding what jobs the claimant would be able to perform, given his RFC.  *Tackett*, 180 F3d at 1101.  An ALJ must propose a hypothetical that sets forth all the reliable limitations and restrictions of a claimant that

are supported by substantial evidence. *Roberts v. Shalala*, 66 F3d 179, 184 (9th Cir 1995). The hypothetical must be "accurate, detailed, and supported by the record." *Tackett*, 180 F3d at 1101. "If a hypothetical fails to reflect each of the claimant's limitations supported by "substantial evidence," the expert's answer has no evidentiary value." *Osenbrock v. Apfel*, 240 F3d 1157, 1167 (9th Cir 2001), citing *Gallant v. Heckler*, 753 F2d 1450, 1456 (9th Cir 1984).

Nigh contends that the ALJ's hypothetical to the VE was deficient because it did not properly account for Nigh's need to have access to a restroom. As worded in the RFC, Nigh contends that the restroom restriction is not a meaningful limitation as it merely reiterates that Nigh must have access to a restroom during regular breaks as required by law, namely "before work[,] at the traditional two-hour break, lunch, two-hour break in the afternoon[,] and after work." Tr. 298. When the VE asked for clarification regarding restroom access, the ALJ responded that he was "envisioning a standard work situation where one would come in, in the morning at 8:00, have a break at 10:00," and "at the time of a break, someone could use the restroom for the period of that break." *Id*. The VE testified that based upon this restriction, Nigh would be unable to perform his past relevant work as a salesman, waiter, or private investigator because those jobs "are not predictable," as they do not allow for regularly scheduled breaks of the type described by the ALJ. *Id*. However, the VE testified that a person of Nigh's age, education, work experience, and RFC could work as an office helper or room cleaner. Tr. 299.

The ALJ presented a second hypothetical, adding that the person would be unable to work a full day or a full work week and would miss two or more days per month more than the employer would normally allow. The VE responded that such a person would not be able to

maintain full-time employment.  *Id.*  Nigh's counsel clarified the second hypothetical, adding

that the person is not absent from work two days per month, but the equivalent of two days of

production would be lost "because he had to be in the bathroom or he had to be lying down."

Tr. 299-300.  The VE responded that such an individual would be precluded from full-time

employment because "in unskilled or entry-level employment [there] is a need to kind of attend

to the job on a consistent basis."  Tr. 300.

       As discussed above, the ALJ erred by failing to properly evaluate both Nigh's testimony

and the lay witness testimony which bore a direct relation to the restroom access limitation.

While the limitation in the RFC as presented to the VE reflects the nature of Nigh's need for

access to a restroom, it fails to provide for his sometimes urgent need for access and often

lengthy duration.  Given the testimony by the VE in response to the second hypothetical as

presented by the ALJ and expanded upon by Nigh's counsel, this distinction is critical to whether

Nigh can sustain full-time, competitive employment.  Therefore, the hypothetical was improper

because it was not based upon limitations supported by the record as a whole.  Consequently, the

ALJ erred at step five.

## IV.  Remand

       After finding that the ALJ erred, this court has discretion whether to remand for an

immediate award of benefits or for further proceedings.  *Harman v. Apfel*, 211 F3d 1172, 1178

(9th Cir), *cert denied*, 531 US 1038 (2000).  A remand for an award of benefits is appropriate

when no useful purpose would be served by further administrative proceedings because the

record has been fully developed and the evidence is not sufficient to support the Commissioner's

decision, and it is clear from the record the ALJ would be required to award benefits.  *Holohan*

*v. Massanari*, 246 F3d 1195, 1210 (9th Cir 2001).  "[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."  *Moisa v. Barnhart*, 367 F3d, 882, 886 (9th Cir 2004), quoting *INS v. Ventura*, 537 US 12, 16 (2002) (*per curiam*).

Even crediting the testimony of Nigh and the lay witnesses as true, it is not clear that the ALJ would be required to award benefits because the VE was not presented with an accurate depiction of Nigh's restroom access needs.  Nigh argues that the VE's response to the second hypothetical is sufficient to award benefits.  However, that second hypothetical does not specifically address whether Nigh's urgent and frequent use of a restroom would preclude full-time employment.  Instead, it assumed that such a limitation would result in two days loss of production time.  Although the VE explained that "in unskilled or entry-level employment [there is] a need to kind of attend to the job on a consistent basis" (Tr. 300), that response also assumed the loss of two days of production time whether due to absence or frequent restroom breaks.  The record does not reveal how much loss of production time would result from Nigh's unpredictable need for restroom access.  Although the record supports Nigh's need for 10-15 restroom breaks of indeterminate length per day, it is unknown how many breaks he would need and for how long during an eight-hour shift, as opposed to a 24-hour day, and whether such breaks would preclude all competitive full-time employment.  This court is not a position to draw a conclusion in Nigh's favor absent further development of the record and the expertise of a VE.

Moreover, even if is reasonable to conclude that Nigh would lose the equivalent of two days of production per month due to his symptoms, he faces another hurdle.  Although the ALJ did not address this issue, and had no need to do so given his other findings, a treatable condition

or a condition that can be controlled by medications is not disabling.  *Warre v. Comm'r of Soc. Admin.,* 439 F3d 1001, 1006 (9th Cir 2006).  Both Dr. Maveety and Dr. Jensen believe that Nigh's disease is treatable, although they do not specify to what extent his symptoms would be eased.  Although Nigh was provided the paperwork necessary to secure financial assistance for treatment, he either failed to complete that paperwork (or the paperwork was mishandled) and instead pursued disability benefits.  If free medical treatment is available which would restore a claimant's ability to work, then the claimant's indigence does not excuse his failure to seek medical treatment.  *See Qualls v. Apfel*, 206 F3d 1368, 1373 (10th Cir 2000); *Osborne v. Barnhart*, 316 F3d 809, 812 (8th Cir 2003); *Johnson v. Bowen*, 866 F2d 274, 275 (8th Cir 1989).  Nigh presented evidence of a lack of funds and insurance, but presented no evidence that he lacked the mental acumen or had any other justifiable excuse for not seeking financial assistance for treatment.  However, as noted above, it appears he was not given an opportunity to respond to the post-hearing evidence from Dr. Maveety that he never completed the proper paperwork.

If the prescribed treatment would restore his ability to work and Nigh refused that treatment without a legitimate excuse, then he is not disabled.  However, the record is not sufficiently developed in that regard.  Accordingly, remand is appropriate to further develop the record in the following ways:  (1) to determine the extent to which the treatment prescribed by Dr. Maveety would improve Nigh's symptoms, including frequent and unpredictable need for restroom access; (2) if so, to determine whether Nigh has a legitimate excuse for failing to seek the financial assistance available for that treatment; and (3) if so, to obtain testimony from a VE regarding whether any jobs exist in significant numbers in the national economy that Nigh can perform, given his need for frequent and unpredictable access to a restroom.

**ORDER**

For the reasons stated above, the Commissioner's decision is REVERSED AND

REMANDED pursuant to Sentence Four of 42 USC § 405(g) for further administrative

proceedings consistent with the Opinion and Order.

DATED this 14th day of June, 2010.

s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge